REGIONS BANK,                                  )
                                               )
      Plaintiff,                       )
                                               )
v.                                             )     Civil No. 3:12-cv-01113
                                               )     Judge Aleta A. Trauger
JP REALTY PARTNERS, LTD.; JP-MOBILE,           )
LLC, JP-CB, LLC; JP-2525 MONT, LLC, and        )
MARK JORDAN,                                    )
                                               )
      Defendants.                      )

## MEMORANDUM

The defendants have filed a Motion to Change Venue (Docket No. 2), and the plaintiff has filed a Motion to Remand (Docket No. 6). With respect to these motions, the plaintiff has filed an Opposition to the Motion to Change Venue (Docket No. 5), and the defendants have filed a combined Response in Opposition to the Motion to Remand and Reply concerning the Motion to Change Venue (Docket No. 13). For the reasons stated herein, the Motion to Remand will be granted and the Motion to Change Venue will be denied as moot.

## BACKGROUND

**I.**    **Overview**

Broadly, this case concerns whether the defendants must pay the plaintiff, Regions Bank, for certain outstanding liabilities of JP-Nashville, LLC ("JP-Nashville"), a Tennessee limited liability company that defaulted on its obligation to pay rent and other expenses related to a building and associated land located at 401 Union Street in Nashville, Tennessee (the "401 Union Street Property").

1

The case was originally filed in Tennessee state court against defendants Mark Jordan, JP Realty Partners, Ltd. ("JP Realty"), and three Texas limited liability companies in which Mr. Jordan has a controlling interest, JP-Mobile, LLC ("JP-Mobile"), JP-CB, LLC ("JP-CB"), and JP-2525 Mont, LLC ("JP-2525"). After JP-Nashville filed for bankruptcy in the Bankruptcy Court for the Northern District of Texas (hereinafter, the "Bankruptcy Court"), the defendants removed the case to this court, and they now seek to transfer it to the Bankruptcy Court based on bankruptcy jurisdiction. Regions Bank argues that this court does not have bankruptcy jurisdiction over the case and, therefore, must remand it to Tennessee state court for lack of subject matter jurisdiction.

## II. Factual Background[1]

In the early 1970s, the Industrial Development Board of the Metropolitan Government of Nashville and Davidson County (the "IDB") financed construction of a building on the 401 Union Street Property through a bond issuance. With respect to this building, the IDB entered into a series of transactions with Fidelity Federal Savings & Loan Association of Nashville ("Fidelity"), under which (1) the IDB agreed to make payments to the third-party lessors of the land comprising the property (including rent and other expenses) and (2) Fidelity agreed to lease the building on the 401 Union Street Property from IDB, paying rent and other expenses to IDB as a sub-tenant (as this court understands the series of transactions). Fidelity eventually merged

---

[1]Unless otherwise noted, the facts are drawn from the Amended Complaint (Docket No. 4, Ex. 25) and the original Complaint (*id.*, Ex. 1), to the extent it provided certain contextual factual allegations not present in the Amended Complaint. The nature of the transactions and corporate relationships underlying this case are complex. Thus, the court's summary of the background facts simply reflects the court's best interpretation of the underlying allegations for purposes of the pending motions only and should not be construed as constituting findings of fact in any respect.

with another bank, which in turn merged with Regions Bank. Thus, as of 2005, Regions Bank was subject to the IDB lease obligations.

As of January 14, 2008, the 401 Union Street Property had no tenants and was generating no rental income.[2] On that date, Regions Bank entered into the first iteration of a Purchase and Sale agreement with JP Realty, a Texas company controlled by Mr. Jordan,[3] relating to 13 properties in which Regions Bank had an interest, including the 401 Union Street Property. Subject to several subsequent amendments, that agreement was finalized on June 17, 2008 (collectively, "Purchase and Sale Agreement"). In most relevant part, JP Realty assumed Regions Bank's lease agreement with the IDB, including the obligation to make payments for rent and other expenses.[4]

On June 20, 2008, three days after Mr. Jordan executed the Purchase and Sale Agreement on behalf of JP Realty, 13 "single-purpose" entities were formed – allegedly at the direction of Mr. Jordan – naming Mr. Jordan as the sole member of each company.[5] On June 30, 2008, JP Realty assigned its interests in the 13 properties to the 13 single-purpose entities, including an assignment to JP-Nashville of JP Realty's newly acquired interest in the 401 Union Street

---

[2]It appears that, although Regions Bank retained a leasehold interest in the property, no rent-paying tenants actually occupied the building.

[3]JP Realty is composed of the Jordan 2004 Family Trust ("Jordan Family Trust"), for which Mr. Jordan serves as the trustee, and Trevmar, LLC, of which Mr. Jordan is the President, sole member, and owner.

[4]Although not stated in the Amended Complaint, the court presumes that Mr. Jordan and JP Realty intended to attract rent-paying third-party tenants to the 401 Union Street Property.

[5]On June 25, 2008, Mr. Jordan assigned his interests in these entities to JP Office Fund I, LP ("JP Office"), for $10 and an assumption of liabilities. JP Office was itself a partnership of the Jordan Family Trust and "J&P Realty Services, Inc.," which Mr. Jordan owns and controls, and for which he serves as President.

3

Property.  In connection with this assignment, Mr. Jordan signed on behalf of each party to the agreement, including JP Office and the 13 single-purpose entities.  (*See* Docket No. 4, Ex. 3, Answer of JP Realty in *Regions II*, at pp. 64-69.)

In conjunction with the assignment, JP-Mobile, JP-CB, JP-Nashville, and JP-2525 assumed the obligation to pay Regions Bank the purchase price for each assigned property subject to the Purchase and Sale Agreement.[6]  These entities did not have sufficient capital to finance the property purchases.  Therefore, on June 30, 2008, the date of the assignment, these four entities collectively took out a $10.75 million loan from a third party, Liberty Bank Life Insurance Company ("Liberty Bank"), utilizing their contemporaneously acquired property interests collectively as collateral.

On September 30, 2008, these four entities collectively took out another multi-million dollar loan from Liberty Bank, again using their property interests as collateral.  As of that time, JP-Nashville had not generated – and ultimately never did generate – any rental income from the 401 Union Street Property.  Regions Bank alleges that, several months after the four borrowing companies took out this second loan, Mr. Jordan and JP Realty determined that the 401 Union Street Property was unlikely to generate a meaningful return on investment.  Nevertheless, the four companies continued to request (and receive) millions of dollars of principal increases on the second loan, utilizing JP-Nashville's interest in the 401 Union Street Property as part of the collateral security for these increases.  Thus, each increase further encumbered the 401 Union Street Property, even though JP-Nashville had no prospect of repaying its allocable share of the

---

[6]The Purchase and Sale Agreement provided for payment to Regions Bank after the final iteration of the agreement.

loan. Moreover, Regions Bank alleges that, instead of allocating loan proceeds to fund JP-Nashville's obligations – including necessary maintenance and repair expenses at the 401 Union Street Property – Mr. Jordan and/or JP Realty used the proceeds to fund obligations relative to Mr. Jordan's other projects.

Essentially, Regions Bank alleges that the defendants utilized JC-Nashville to perpetrate a fraud on the bank. The central allegation is that Mr. Jordan and the companies he controlled improperly commingled the assets of JC-Nashville, which was under-capitalized, with those of JP-Mobile, JC-PB, and JP-2525 in order to obtain loans to fund other projects. That is, Mr. Jordan and the other defendants saddled JC-Nashville with debt it had no prospect or intention of repaying, while encumbering the 401 Union Street Property with debt far in excess of its value. Regions Bank contends that these entities did not maintain an arms-length relationship with each other and were all effectively controlled by Mr. Jordan.[7]

In early 2009, JP-Nashville defaulted on its lease obligations. Accordingly, at an unspecified point, the IDB terminated the lease and demanded a $360,000 termination fee to which it was entitled, along with unpaid rent and other amounts due under its lease agreement.[8] The IDB demanded payment directly from Regions Bank, which was ultimately responsible to cover JP-Nashville's breach.

## II.    Procedural History

---

[7]The Amended Complaint also, at times, characterizes JP-Mobile, JP-CB, and JP-2525 as "sham entities." (*See* Am. Compl.¶ 85.)

[8]It is not clear from the record when the IDB declared a default. Regardless, based on the Amended Complaint allegations, it does appear that JP-Nashville continued to seek loan modifications with Liberty Bank at least through May 2011. (*See* Am. Compl. ¶ 70.)

5

## A. *Regions I* and *Regions II*[9]

At an unspecified point before June 25, 2011, Regions Bank sued JP-Nashville in Tennessee state court (*Regions Bank v. JP-Nashville, LLC*, Docket No. 11-59-III) (hereinafter "*Regions I*")), demanding compensation for both liquidated and unliquidated damages related to JP-Nashville's breach of contract. JP-Nashville filed an Answer in *Regions I*, in which it admitted that, as of 2009, it had failed to pay rent and other expenses due.

On June 25, 2011, Regions Bank filed the instant action in Tennessee state court against JP Realty only (*Regions Bank v. JP-Realty Partners, Ltd.*, No. 11-791-III (hereinafter "*Regions II*")), arguing that JP Realty had assumed the lease obligations and/or that the trial court should "pierce the corporate veil" to hold JP Realty liable for JC Nashville's default. On January 25, 2012, Regions Bank filed an Amended Complaint, in which it added JP-Mobile, JP-CB, JP-2525, and Mr. Jordan as defendants. The Amended Complaint essentially alleges that these companies and Mr. Jordan are all liable for JC-Nashville's default, either directly or as "alter egos" of JP-Nashville. Each named defendant responded to the Amended Complaint: Mr. Jordan, JP-CB, and JP Realty filed Answers, while JP-Mobile and JP-2525 Mont filed a Motion to Dismiss for Lack of Personal Jurisdiction, which was pending on the date of the removal to

---

[9]In connection with the Notice of Removal of this case (referenced herein as "*Regions II*"), the defendants filed a copy of various entries on the Tennessee trial court docket (*see* Docket No. 4), including a printout of the docket sheet (*id.*, Attachment No. 42). In comparing the docket sheet with the previous 41 attachments, it appears that copies of certain docket entries are missing from the record before this court, such as JP-CB's Answer. However, it does not appear that any of these omissions are material to the disposition of the pending motions, nor have the defendants raised any objection in this regard. The court also notes that, although no entries in the *Regions I* docket are contained in the record here, the Amended Complaint makes allegations concerning the *Regions I* lawsuit (*see* Am. Compl. ¶ 12) that Mr. Jordan "admitted" were true in his Answer (*see* Docket No. 4, Attachment No. 26, at ¶ 12). Accordingly, for purposes of the pending motions, the court will rely on the representations regarding *Regions I* as true.

this court. (*See* Docket No. 4, Attachment No. 38, *Regions II* Agreed Order, dated Aug. 21, 2012.)

On September 12, 2011, the trial court in *Regions I* entered a judgment against JP-Nashville, which stated that JP Nashville was liable for (a) the $360,000 termination fee, (b) all expenses incurred by Regions Bank and/or IDB under the lease after June 30, 2008, and (c) the costs for necessary maintenance and repairs of the 401 Union Street Property. It appears that the trial court has not yet issued a damages award.

Before removal, the parties in *Regions II* engaged in some fact discovery, including written discovery and at least one deposition.

### B. Bankruptcy Proceedings and Impact on *Regions II*

On October 26, 2012 – two days after new counsel entered an appearance in *Regions II*[10] – JP-Nashville filed a voluntary petition for bankruptcy in the Bankruptcy Court for the Northern District of Texas, pursuant to Chapter 7 of the United States Bankruptcy Code. *See In Re: JP-Nashville,. LLC*, Case No. 12-26771-sgj7 (N.D. Tex. Bankr.) ("*In Re JP-Nashville I*").

On that same date, the defendants in *Regions II* removed that case to this court based on bankruptcy jurisdiction (*see* Docket No. 1, Notice of Removal) and filed a concurrent Motion to Transfer to the Bankruptcy Court for further proceedings. In the Notice of Removal, the defendants represented that this case (1) involves claims against JP-Nashville, and/or (2) involves *alter ego* claims against the defendants that constitute property of JP-Nashville's

---

[10]On August 14, 2012, the *Region II* defendants' trial counsel filed a Motion to Withdraw, citing the defendants' failure to "fulfill certain conditions of representation." (Docket No. 4, Attachment No. 37). The trial court granted that motion on September 10, 2012 (*id.*, Attachment No. 39), and new counsel filed a Notice of Appearance on October 24, 2012 (*id.*, Attachment No. 41).

bankruptcy estate. Accordingly, the Notice of Removal sought to establish that this court has subject matter jurisdiction pursuant to 28 U.S.C. § 1334 and that this case constitutes a "core proceeding" under 28 U.S.C. § 157(b)(2)(A), (B), (C), (K), and (O).[11]

On November 15, 2012, the Bankruptcy Court dismissed *In Re JP-Nashville I* without prejudice, apparently due to JP-Nashville's failure to timely file certain schedules to its Chapter 7 bankruptcy petition. (*See In Re JP-Nashville I* Docket Nos. 9-10.) However, on November 26, 2012, JP-Nashville filed a renewed bankruptcy petition on essentially the same grounds. *See In Re JP-Nashville, LLC*, 12-37361-hdh7 (N.D. Tex. Bankr.) ("*In Re JP-Nashville II*").

Here, the defendants argue that this case should be transferred to the Bankruptcy Court for consolidation into *In Re JP-Nashville II*.[12] Regions Bank chiefly argues that the transfer issue is moot because this court lacks subject matter jurisdiction over this case.

## ANALYSIS

### I. Arguments Concerning the Motion to Remand and Motion to Transfer Venue

The parties acknowledge that their arguments concerning the Motion to Remand and the Motion to Transfer Venue are substantially related.

Regions Bank argues that this court must address the issue of subject matter jurisdiction before addressing whether transfer would be appropriate. With respect to subject matter

---

[11]The defendants did not remove on the basis of diversity. Even if the parties are diverse, the time frame in which to remove on that basis appears to have lapsed as of the date of removal in any case.

[12]After the Bankruptcy Court dismissed *In Re JP-Nashville I*, Regions submitted supplemental briefs in this case, arguing that the dismissal justified remand of this case to Tennessee state court. (Docket Nos. 9 and 10.) However, JP-Nashville's filing of a renewed bankruptcy petition in *In Re JP-Nashville II* has mooted this particular argument by Regions Bank. Therefore, the court will address the merits of the parties' jurisdictional arguments.

8

jurisdiction, Regions Bank argues that the case does not fall within any of the bases for jurisdiction articulated in 28 U.S.C. § 1334, because (1) JP-Nashville is not a defendant here, and (2) the *alter ego* theories of liability against the defendants are not "property" of JP-Nashville's estate. Regions Bank also argues that, even if the court were to find that the case meets the requirements of § 1334, the court should abstain from exercising jurisdiction, pursuant to the permissive abstention doctrine set forth in § 1334(c)(1).

In response, JP-Nashville makes several arguments. First, JP-Nashville argues that this court should not address the matter of subject jurisdiction in the first place, because the issue is appropriately reserved for the Northern District of Texas Bankruptcy Court. Second, JP-Nashville argues that, even if the court were to address the substance of the Motion to Remand, bankruptcy jurisdiction is appropriate under § 1334 because (1) *Regions II* involves claims against JP-Nashville (*i.e.*, that JP-Nashville is actually a defendant in this case) and/or (2) that *alter ego* claims against the defendants are property of JP-Nashville's estate, which the trustee could assert on behalf of JP-Nashville's creditors. Third, JP-Nashville argues that, even if this court believes that jurisdiction under § 1334 is lacking, the court should transfer the case to the Bankruptcy Court to avoid the risk of a parallel proceeding against the defendants.

## II.   <u>Order of Adjudication</u>

The parties disagree as to whether this court should address the subject matter jurisdiction issue before addressing the venue issue. Regions Bank argues that the court must establish that it has subject matter jurisdiction before addressing whether it can transfer the case. By contrast, the defendants argue that this court should transfer the action and permit the transferee bankruptcy court to address whether this case implicates bankruptcy jurisdiction and,

9

if so, whether the doctrine of permissive abstention should apply. There appears to be no binding United States Supreme Court or Sixth Circuit authority on this issue, on which courts within the Sixth Circuit (and outside of it) have reached differing conclusions in a variety of contexts. *See, e.g.*, *MD Acquisition, LLC v. Myers*, No. 2:08-cv-494, 2009 WL 466383, at *4-*7 (S.D. Ohio Feb. 23, 2009) (finding that court to which case was removed should transfer case to bankruptcy court to determine subject matter jurisdiction); *Meritage Homes Corp. v. JP Morgan Chase Bank, N.A.*, 474 B.R. 526, 555 (Bankr. S.D. Ohio June 26, 2012) (finding that court to which case was removed must determine it has subject matter jurisdiction before addressing transfer).

This court is persuaded that, at least under the circumstances presented here, federal law requires the court to address the issue of subject matter jurisdiction first. As a general matter, if a federal court lacks subject jurisdiction over a case, the court is divested of any authority to act. *See Douglas v. E.G. Baldwin & Assocs., Inc.*, 150 F.3d 604, 606 (6th Cir. 1998) ("The primacy of jurisdiction is evident, for without it courts have no power.") Reflecting this principle, the general federal removal statute provides that, "[i]f *at any time* before final judgment it appears that the district court lacks subject matter jurisdiction, *the case shall be remanded*." 28 U.S.C. § 1447 (2012) (emphases added). Similarly, Rule 12(h)(3) provides that, "i[f] the court determines *at any time* that it lacks subject matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3) (2012) (emphasis added.) Based on these general principles and dictates, federal courts, including courts within the Sixth Circuit, often address the issue of subject matter jurisdiction first, before addressing whether transfer to a bankruptcy court in another jurisdiction is appropriate. *See, e.g., Meritage Homes*, 474 B.R. at 555 (collecting cases); *Concord*

10

*Telephone Exchange, Inc. v. Halo Wireless, Inc.*, No. 3:11-0796, 2011 WL 5325572, at *1-*2 (M.D. Tenn. Nov. 3, 2011).[13]

This approach is supported by the text of the bankruptcy removal statute and bankruptcy transfer statute. Under the bankruptcy removal statute, "[a] party may remove any claim or cause of action in a civil action . . . to the district court for the district where such civil action is pending, *if such district has jurisdiction of such claim or cause of action under § 1334 of this title.*" 28 U.S.C. § 1452(a) (2012) (emphasis added). Under a straightforward reading of this provision, removal is proper only if the district court to which the case is removed "has jurisdiction" over the case. By the same token, if the district court to which the case is removed lacks jurisdiction under § 1334, removal is improper *ab initio*. Similarly, the bankruptcy transfer statute, 28 U.S.C. § 1412 (2012), provides that "[a] district court *may* transfer *a case or proceeding under title 11* to a district court for another district, in the interest of justice or for the convenience of the parties." *Id.* (emphases added). As with § 1452, the transfer statute implicitly assumes that the case to be transferred is properly cognizable in bankruptcy prior to transfer, and affords the local bankruptcy court (*i.e.*, the court to which the case was removed) discretion as to whether to transfer it. Thus, the court does not interpret the bankruptcy removal and transfer provisions as inconsistent with the general rule that a federal court should determine

---

[13]*See also In Re Santa Clara Cnty. Child Care Consortium*, 223 B.R. 40, 50 (B.A.P. 1st Cir. 1998); *Baxter Healthcare Corp. v. Hemex Liquidation Trust*, 132 B.R. 863, 855 (N.D. Ill. 1991); *New England Wood Pellet, LLC v. New England Pellet, LLC*, 419 B.R. 136-37 (D.N.H. 2009). In cases not involving bankruptcy jurisdiction, some courts have found that, under appropriate circumstances, it can be appropriate to address the transfer issue before the issue of subject matter jurisdiction, such as where a related case is already pending in the proposed transferee court. *See, e.g.*, *Jabo's Pharmacy, Inc. v. Cephalon, Inc.*, No. 2:09-cv-289, 2010 WL 3851966, at *1 (E.D. Tenn. Sept. 27, 2010) (collecting cases).

whether it has subject matter jurisdiction over a case under § 1334 before evaluating whether to transfer it to the bankruptcy court. Various federal courts analyzing these statutes have reached the same conclusion. *See, e.g.*, *In re AG Indus., Inc.*, 279 B.R. 534, 540 (Bankr. S.D. Ohio 2002) ("As made clear from the language of the removal statute, a civil action can only be removed to a bankruptcy court if a bankruptcy court could establish jurisdiction under 28 U.S.C. § 1334."); *see also In re Scanware, Inc.*, 411 B.R. 889, 896-97 (Bankr. S.D. Ga. 2009); *Landry v. Exxon Pipeline Co.*, 260 B.R. 769, 775 (Bankr. M.D. La. 2001) ("As 28 U.S.C. § 1452 enables a removal if a federal court has jurisdiction under 28 U.S.C. § 1334, the first task for this Court, then, is to determine whether it has jurisdiction under 28 U.S.C. § 1334.")

This court does not adopt the reasoning of other federal courts that have found that "transfer first" is necessarily the appropriate approach. *See, e.g.*, *MD Acquisition*, 2009 WL 466383, at *4-*7; *Consolidated Lewis Inv. Corp. v. First Nat'l Bank of Jefferson Parish, et al.*, 74 B.R. 648, 650-51 (E.D. La. 1987). These courts typically reach this contrary conclusion based on (1) their interpretation of § 157(b)(3), which provides that "the bankruptcy judge shall determine . . . whether a proceeding is a core proceeding under this subsection or is a proceeding that is otherwise related to a case under title 11," and/or (2) a policy rationale that bankruptcy courts are in a better position to determine whether matters are sufficiently related to a bankruptcy proceeding and would provide for efficient administration of the debtor's estate, thereby justifying transfer to the home bankruptcy court to address jurisdictional matters.

With respect to the first point, the determination required by § 157(b)(3) does not completely control the subject matter jurisdiction issue. *McKinstry v. Sergent*, 442 B.R. 567, 571 (E.D. Ky. 2011). A "core proceeding" is one that a bankruptcy court can finally resolve,

with respect to which the court can issue *final* judgments and orders, as opposed to a "non-core proceeding" that is sufficiently "related to" a title 11 case, with respect to which a bankruptcy court may only issue *proposed* findings of fact and conclusions of law. Thus, the requirement that bankruptcy judges must make a finding as to "core"/ "non-core" can be construed – in harmony with § 1452 – as simply directing bankruptcy judges to the scope of their own authority as to matters properly before it. *Id.* at 571; *see also Kennilworth Partners II LP v. Crisman*, No. C-00-3218 VRW, 2001 WL 30534, at *2-*3 (N.D. Cal. Jan. 3, 2001). As to the second point, while there may be situations in which it would be more efficient for a bankruptcy judge to address the issue of subject matter jurisdiction in the first instance, that point does not override the dictates of the Federal Rules of Civil Procedure and federal statutory law, at least under the circumstances presented here. Regardless, the policy justification is very weak here, because *In Re JP-Nashville II* is only in its initial filing stages and, for the reasons explained herein, federal jurisdiction over this turns on a pure issue of Tennessee law, not on prudential considerations about the efficient administration of JP-Nashville's bankruptcy estate.

Ultimately, the court is persuaded that, if it does not have subject matter jurisdiction over this case in the first place, it cannot transfer the matter to the Bankruptcy Court. Therefore, the court will address the merits of the Regions Bank's Motion to Remand, which requires the court to determine whether the case meets any of the requirements for bankruptcy jurisdiction set forth in § 1334.[14]

_____

[14]Because the court ultimately finds that § 1334 does not support bankruptcy removal under § 1452 in the first place, the parties' arguments concerning permissive abstention under § 1334(c)(1) and equitable remand under § 1452(b) are moot. Because these arguments are moot, the court expresses no opinion as to whether, if § 1334 were otherwise satisfied, this court or the Bankruptcy Court should determine whether permissive abstention or equitable remand would be

13

**III.** **Analysis Under § 1334**

    **A.**     **JP-Nashville is Not a Party to this Case**

        The defendants argue that this case involves claims against JP-Nashville. Apparently to reinforce this contention, the defendants have included *In Re: JP-Nashville II* in the caption to each of its filings here, and, following removal, JP-Nashville has even purported to file an Answer (*see* Docket No. 11). Notwithstanding these late-breaking maneuvers, the court does not construe the *Regions II* Amended Complaint as asserting claims against JP-Nashville, either explicitly or constructively. JP-Nashville is not named as a defendant, Regions Bank seeks no relief in this action from JP-Nashville, and Regions Bank has already litigated the *Regions I* lawsuit – in which JP-Nashville *is* a defendant – to judgment. Moreover, before removal, JP-Nashville did not respond to the Complaint or Amended Complaint in this case, and JP-Realty specifically represented to the *Regions II* state trial court that JP-Nashville was *not a party* to the case for discovery purposes. (*See* Docket No. 4, Attachment No. 15, JP Realty's Opposition to Regions Bank's Motion to Compel (arguing that JP Realty could not be compelled to produce records in possession, custody, or control of "third party entities" such as JP Nashville)). Thus, the court finds that this case does not involve claims against JP-Nashville.

    **B.**     *Alter Ego* **Claims are Not "Property of the Estate" under Tennessee law**

        1.     Applicable Law and Choice of Law

        Under § 704 of the Bankruptcy Code, a Chapter 7 trustee must "collect and reduce to

---

appropriate. *See, e.g.*, *MD Acquisition*, 2009 WL 466383, at *5-*6 (finding that "[q]uestions of permissive abstention and equitable remand are [] better left to the bankruptcy court."); *Kennilworth*, 2001 WL 30534, at *2-*3 (finding that court to which case was removed was obligated to address equitable remand and abstention arguments before addressing transfer).

14

money the *property of the estate* for which the trustee serves." 11 U.S.C. § 704(1) (emphasis added); *In Re RCS Engineered Prods. Co.*, 102 F.3d 223, 225 (6th Cir. 1996). Section § 541(a)(1) defines "property of the estate" to include "all legal or equitable interests of the debtor in property as of the commencement of the case." Causes of action belonging to the debtor prior to bankruptcy constitute estate property, and § 704(1) grants the bankruptcy trustee authority to pursue such causes of action. *In Re RCS*, 102 F.3d at 225. Here, the defendants argue that the *alter ego* claims asserted against them by Regions Bank constitute property of the JP-Nashville estate, which the trustee in *In Re JP-Nashville II* can pursue on behalf of the estate's creditors, thereby supporting jurisdiction under § 1334.

"Whether a particular cause of action is available to the debtor, and thus constitutes 'property of the estate,' is determined by state law." *Id.* (citing *Butner v. United States*, 440 U.S. 48, 99 S. Ct. 914, 59 L. Ed. 2d 136) (1979)). Thus, if state law allows a debtor corporation to assert an *alter ego* claim against its shareholders or its parent company by disregarding its corporate entity, the claim is "property of the estate," and the trustee in the bankruptcy proceeding would have standing to assert it on behalf of that debtor corporation. *Id.* (applying Michigan state law); *see also In Re Schimmelpenninck*, 183 F.3d 347, 350 (5th Cir. 1999) (applying Texas law).

Here, the parties dispute whether Texas law or Tennessee law should govern this issue. As a general matter, the default rule is that the law of the state in which a corporate entity was incorporated or formed governs the issue of whether that company's corporate form should be ignored. *See Thomas v. Lytle*, 104 F. Supp. 2d 906, 927 (M.D. Tenn. 2000); *United States v. Daugherty*, 599 F. Supp. 671, 673 (E.D. Tenn. 1984); *see also Kalb, Voorhis & Co. v. Am. Fin.*

15

*Corp.*, 8 F.3d 130, 132 (2d Cir. 1993); *Soviet Pan Am. Travel Effort v. Travel Committee, Inc.*, 756 F. Supp. 126, 131 (S.D.N.Y. 1991) ("Because a corporation is a creature of state law whose primary purpose is to insulate shareholders from legal liability, the state of incorporation has the greater interest in determining when and if that insulation is to be stripped away."); Restatement (Second) of Conflict of Laws § 307 (2012) ("The local law of the state of incorporation will be applied to determine the existence and the extent of a shareholder's liability to the corporation for assessments or contributions and to its creditors for corporate debts"); 1 Fletcher Cyc. Corp. § 41.90 (2012) ("[I]t has been stated that the state of incorporation has the greater interest in determining when and if the corporate veil should be pierced.").  JP-Nashville is a Tennessee limited liability company.  Therefore, Regions Bank argues that Tennessee law should govern whether to ignore its corporate form and, by extension, whether the *alter ego* claim is property of JP-Nashville's estate.

In response, the defendants appear to argue that Texas law should govern the issue, simply because the bankruptcy proceeding has been filed in Texas.  In support of this position, the defendants cite to *In Re Schimmelpenninck*, in which the Fifth Circuit applied Texas law in the context of a bankruptcy proceeding involving a foreign party pursuant to 11 U.S.C. § 304, a since-repealed section of the Bankruptcy Code that included procedures for staying domestic cases ancillary to a "foreign proceeding" – *i.e.*, a proceeding in a foreign country.  183 F.3d at 350.  There, the appellants, who essentially were acting as trustees for a debtor subject to bankruptcy proceedings in the Netherlands, sought an order restraining a creditor from pursuing a Texas state court lawsuit asserting various *alter ego* claims, which threatened to diminish the debtor company's estate.  *Id.*  In determining which body of law governed the *alter ego* issue, the

16

Fifth Circuit applied case law specific to § 304, which provided that, "[t]o ascertain the property ownership of a foreign bankruptcy estate, the law of the jurisdiction where the section 304 proceeding is pending determines whether the debtor has a valid ownership interest in the property." *Id.* at 356 n.18. The Fifth Circuit's analysis does not apply to the circumstances presented here: this case does not involve a domestic lawsuit that is ancillary to a bankruptcy proceeding in a foreign country, nor does it involve a motion to restrain a state court proceeding. Thus, whatever the strength of its reasoning, *In Re Schimmelpenninck* does not suggest that this court is obliged to apply Texas law simply because a domestic debtor filed for bankruptcy within the state of Texas.

Aside from the inapposite reference to *In Re Schimmelpenninck*, the defendants have not identified any authority contradicting the general rule, relied upon by Regions Bank, that the law of the state of formation (here, Tennessee) should govern the *alter ego* issue. Accordingly, the court will apply Tennessee law in determining whether an *alter ego* theory of liability against the defendants constitutes property of JP-Nashville's estate.

2.    Tennessee Law Concerning *Alter Ego* Theory as Estate Property

The Tennessee Supreme Court has not yet addressed the issue of whether an *alter ego* theory that the debtor is a "sham" corporation constitutes property of that debtor's bankruptcy estate. In the absence of Tennessee Supreme Court precedent, this court "must attempt to ascertain how [the Tennessee Supreme Court] would rule if it were faced with the issue." *Meridian Mut. Ins. Co. v. Kellman*, 197 F.3d 1178, 1181 (6th Cir. 1999). In making this determination, "the court may use the decisional law of the state's lower courts, other federal courts construing state law, restatements of law, law review commentaries, and other

17

jurisdictions on the 'majority' rule," but "should not disregard the decisions of intermediate appellate state courts unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." *Id.* The only authorities interpreting Tennessee law on this issue are *Brown v. Vencap*, 2004 Tenn. App. LEXIS 3424, at *13-15 (Tenn. Ct. App. Mar. 31, 1984), an unpublished decision by the Tennessee Court of Appeals holding that the *alter ego* theory of liability is not property of the debtor's estate under Tennessee law, and *In Re Del-Met Corp.*, 322 B.R. 781, 831-33 (Bankr. M.D. Tenn. 2005), a bankruptcy court decision reaching the same conclusion based on *Vencap*.

Specifically, in *Vencap*, the Tennessee Court of Appeals found that the bankruptcy trustee for a debtor corporation did not have standing in an alter ego action against a venture capital firm that allegedly controlled the debtor. In reaching this holding, the *Vencap* court cited to Tennessee Supreme Court precedent establishing that the "instrumentality rule" against a parent corporation (*i.e.*, an *alter ego* or veil-piercing claim), requires proof of three elements: (1) the parent corporation, at the time of the transaction, exercised "complete dominion" over its subsidiary, (2) "such control must have been used to commit fraud or wrong, . . . in contravention of *third parties' rights*"; and (3) "the aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of." *Id.* (emphasis added) (quoting *Continental Bankers Life Ins. Co. v. Bank of Alamo*, 578 S.W.2d 625, 632 (Tenn. 1979)). Accordingly, the court reasoned as follows:

> *The doctrine of alter ego does not create assets for or in the corporation.* It simply fastens liability upon the individual who uses the corporation merely as an instrumentality in the conduct of his own personal business. The liability springs from fraud. The fraud from which it arises is not perpetrated upon the corporation, *but upon third persons dealing with the corporation.* And the doctrine has been invoked *at the behest of such third parties* as have suffered

18

injury by reason of the fraud.

1984 Tenn. App. LEXIS, at *13-14 (emphases added). Thus, the *Vencap* court concluded that an *alter ego* theory of liability does not constitute property of the debtor's estate for bankruptcy purposes.

In *In Re Del-Met*, a bankruptcy court in this district relied on *Vencap* as the best expression of Tennessee law as to whether a trustee has standing to pierce the debtor company's corporate veil. 322 B.R. at 833-34.

The Sixth Circuit decision in *In Re RCS* reinforces the validity of the holding in *Vencap*. In *In Re RCS*, the Sixth Circuit determined that it was obligated to apply Michigan law to determine whether an *alter ego* theory constituted property of the debtor's estate in bankruptcy. However, there, unlike here, no state appellate court decisions addressed the issue, requiring the Sixth Circuit to reason from first principles and traditional Michigan *alter ego* law. At the time, the Michigan *alter ego* standard required the following elements, which are substantially similar to the Tennessee standard: "first, the corporate entity must be a mere instrumentality of another; second, the corporate entity must be used to commit a fraud or wrong; and third, there must have been an unjust loss or injury to the plaintiff." *In re RCS*, 102 F.3d at 226 (quoting *Noqueras v. Maisel & Assoc. of Mich.*, 369 N.W. 2d 492, 498 (Mich. Ct. App. 1985)). Based on the Michigan standard, the Sixth Circuit reasoned as follows:

> [I]n order for a subsidiary to be able to assert an alter ego claim against its parent company, the subsidiary would need to show that it suffered 'an unjust loss or injury' as a result of it being used by the parent as an instrumentality to commit a fraud or wrong against itself. Since it is axiomatic that one cannot commit a fraud or wrong against oneself, a subsidiary would never be able to satisfy the standard for disregarding corporate identity under Michigan law. It would, therefore, appear that under Michigan law a subsidiary may not assert an alter ego claim against its parent company.

19

The Sixth Circuit also found support for this conclusion in "basic principles of corporations law." *Id.* at 226. Among other things, it reasoned as follows:

> The general rule is that the corporate veil is pierced only for the benefit of third parties, and never for the benefit of the corporation or its stockholders. Furthermore, an alter ego claim is not by itself a cause of action. Rather, it is a doctrine which fastens liability on the individual who uses a corporation merely as an instrumentality to conduct his or her own business, and such liability arises from fraud or injustice perpetrated not on the corporation but on third persons dealing with the corporation. The corporate form may be disregarded only where equity requires the action to assist a third party.

*Id.* (internal citations and quotations omitted).

Although *In Re RCS* involved the application of Michigan law, not Tennessee law, the Sixth Circuit's analysis is consonant with that of the Tennessee Court of Appeals in *Brown v. Vencap*. *Vencap* involved a substantially similar *alter ego* standard and rested on a similar analysis: namely, that the right to sue under an *alter ego* theory inures to the benefit of third parties and, therefore, may be exercised only by third parties, not by or on behalf of the debtor corporation itself. Moreover, in *In Re RCS*, even in the absence of relevant state appellate court precedent (in contrast to the circumstances presented here) the Sixth Circuit reached the same conclusion as the Tennessee Court of Appeals.

The defendants have not cited to any contrary interpretation of Tennessee law on this issue, nor have they argued that, if faced with the issue, the Tennessee Supreme Court would reach a decision contrary to the relevant findings in *Vencap* or *In Re Del-Met*. Accordingly, the defendants here provide no persuasive reason why the court should not treat *Vencap* – and *In Re Del-Met*'s interpretation thereof – as the best indication of how the Tennessee Supreme Court would decide this issue.

Nevertheless, the defendants appear to argue that the court should interpret Tennessee

20

law in the same manner as the Fifth Circuit interpreted Texas law in *In Re Schimmelpenninck*, 183 F.3d at 350. There, the Fifth Circuit found that, *as a matter of first impression* under Texas law, an *alter ego* theory of recovery permits a trustee of a debtor's estate to seek recovery on behalf of the estate against the debtor's parent company. In a footnote, the Fifth Circuit noted that some courts, including the Sixth Circuit in *In Re RCS*, had reached a different interpretation when applying the laws of other states. *Id.* at 356 n.17. If the Fifth Circuit was criticizing the Sixth Circuit's reasoning from "first principles" of Michigan law and general corporations law, that disagreement is largely beside the point here, because, unlike the Fifth Circuit in *In Re Schimmelpenninck* and the Sixth Circuit in *In Re RCS*, this court has the benefit of Tennessee appellate court authority on the issue.

Accordingly, the court is persuaded that *alter ego* claims are not property of JP-Nashville's estate under Tennessee law. The defendants have not articulated any other basis for subject matter jurisdiction. Therefore, the court finds that it does not have subject matter jurisdiction over this case under § 1334, that removal under § 1452 was therefore improper, and that the case must be remanded.

### C. The Defendants' Equitable Argument in Favor of Transfer

The defendants argue that, regardless of its interpretation of Tennessee law, the court should transfer the action to the Bankruptcy Court. They argue that, notwithstanding remand of this case to Tennessee trial court for further proceedings, the Bankruptcy Court might permit the trustee to forge ahead with *alter ego* claims on behalf of the creditors there, either by applying Texas law or by interpreting Tennessee law differently in light of *In Re Schimmelpeninck*. The defendants argue that, if *In Re JP-Nashville II* proceeds in that fashion, the defendants would

21

face potential liability for essentially the same claims both in the *Regions II* Tennessee court action (on remand) and in an adversary proceeding within *In Re JP-Nashville II*.

These equitable arguments are unpersuasive. First, by filing for bankruptcy in the Bankruptcy Court for the Northern District of Texas, rather than within this district, JP-Nashville has essentially created the risk of which it now complains. When it filed for bankruptcy, JP-Nashville already had a judgment against it in Tennessee state court in *Regions I*, and it surely was aware, via Mr. Jordan, of the *Regions II* lawsuit pending in Tennessee state court against its sister companies, its parent, and Mr. Jordan. Although JP-Nashville presumably could have filed for bankruptcy here in Tennessee, where the company was formed, it chose to file in Texas, creating the risk of litigating in two states at once. Second, this court has no reason to believe that the Bankruptcy Court would apply Texas law to this issue or that it would adopt a contrary interpretation of Tennessee law, particularly in light of *Vencap* and *In Re Del Met* – not to mention this court's own opinion. Third, even if there were a realistic risk of parallel litigation by the trustee, the issue is not ripe. The bankruptcy proceedings, which evidently were filed in coordination with the removal of this case, are only in their initial stages. If, at some point in the future, the trustee seeks to assert *alter ego* claims against the defendants, the parties can address this issue in an appropriate forum.

## CONCLUSION

For the reasons stated herein, the court finds that it lacks subject jurisdiction over this case. Accordingly, Regions Bank's Motion to Remand will be granted, the case will be remanded to Tennessee state court, and the defendants' Motion to Transfer will be denied as moot.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge

23